Robert Tauler (SBN 241964)
rtauler@taulersmith.com
Narain Kumar (SBN 301533)
nkumar@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (310) 590-3927

*Attorneys for Plaintiff*
*Sarah Escobedo*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SARAH ESCOBEDO, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERCK SHARP & DOHME LLC, a New Jersey limited liability company; DOES 1 through 25, inclusive<br><br>Defendants. | Case No.: 2:24-cv-10394-MEMF-MAR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 631)**<br><br>**(2) VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF CODE § 17200, ET SEQ.)** |

## I. INTRODUCTION

1. **Merck Sharp & Dohme LLC ("Merck") betrays user trust through covert surveillance.** Merck operates www.merck.com (the "Website"), a platform marketing pharmaceuticals. While users rely on the Website's search bar to navigate drug and company related content, Merck secretly intercepts their private queries and transmits them—along with identifying device data—to third-party advertising and analytics companies.

2. Plaintiff, by and through her counsel, makes the allegations herein based upon personal knowledge as to her own actions and on information and belief as to all other matters. Plaintiff believes substantial evidentiary support exists for the allegations set forth and will be available after a reasonable opportunity for discovery.

3. **Plaintiff Sarah Escobedo experienced this invasion of privacy firsthand.** On September 4, 2024, she visited the Website and searched "work from home jobs California." Unbeknownst to her, Merck's embedded tracking code immediately broadcast her search term to LinkedIn, Google Ads, DoubleClick, and Twitter. These entities used the intercepted data—including unique identifiers and browser specifications—to link Plaintiff's query to her identity, enabling cross-site tracking and profiling.

4. **Merck's conduct violates California Penal Code § 631.** By embedding code that facilitates third-party interception of search queries mid-transit, Merck aids and abets the unlawful capture of electronic communications. Courts have repeatedly

held that website search terms constitute private communications protected under CIPA. Merck's failure to disclose this surveillance—or obtain user consent—renders its actions deliberate and unlawful.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen of a different State or subject of a foreign state.

6. This Court has personal jurisdiction over Merck because Merck intentionally targets California consumers through its interactive, commercial website. Merck's Website is accessible to California residents, including Plaintiff, and is designed to market Merck's pharmaceutical products to a national audience, including Californians. By embedding tracking technologies that intercept and transmit Californians' private communications to third-party entities, Merck has purposefully availed itself of the benefits of conducting business in California, directly causing harm to California residents. Merck deliberately tailors the Website to California users by featuring California-specific career listings, drug pricing disclosures for California consumers, and healthcare provider resources unique to this state. These features,

together with embedded tracking code aimed at collecting Californians' data, illustrate Merck's purposeful direction of conduct toward California

7. Merck's conduct satisfies the "effects test" under *Calder v. Jones*. Merck knew or should have known that its interception of electronic communications—including those of Californians like Plaintiff—would cause harm in California. The unauthorized capture and transmission of Plaintiff's search query and device data to third parties constitutes an intentional tort expressly aimed at California, where Plaintiff resides and where the injury occurred. In fact, Merck's online application portal and resources highlight California roles, further attracting job-seekers like Plaintiff—thereby causing the interception of search queries from California residents, including Plaintiff. In addition, three of the third-parties that Merck sent Plaintiff's data to, LinkedIn, Google, and Twitter, are all located in California. Merck therefore stole data from a California plaintiff to send to other California entities.

8. Jurisdiction is further proper under California's long-arm statute (Cal. Code Civ. Proc. § 410.10). Merck's systematic interception of Californians' private search queries through its Website constitutes "transacting business" in California, as the harm arises directly from Merck's operation of a platform used by California residents.

9. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this

District because it has availed itself of the laws and markets within this District; and the injury to Plaintiff occurred within this District.

## III. PARTIES

10. Plaintiff is a citizen of California residing within Los Angeles County. Plaintiff was located within the Central District of California during the events alleged herein.

11. Defendant Merck Sharp & Dohme LLC is a New Jersey limited liability company with its main office at 2000 Galloping Hill Road, Kenilworth, NJ 07033.

12. The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

13. Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

# IV. FACTUAL ALLEGATIONS

## A. Defendant and its Website.

14. Defendant Merck Sharp & Dohme LLC ("Merck" or "Defendant") is one of the largest pharmaceutical companies in the world, with annual revenues exceeding $59 billion. Merck operates www.merck.com (the "Website"), which serves as a critical portal through which millions of Americans, including California residents, access sensitive information about medications, health conditions, and medical research. Through the Website, Merck deliberately and systematically targets California residents by providing California-specific drug pricing information, healthcare provider resources, and maintaining an active user base of California healthcare providers and patients who rely on the Website's search functionality to access medical information.

15. Merck maintains substantial operations in California, including research facilities and administrative offices. Through these operations and its Website, Merck purposefully avails itself of the California market and knowingly serves California residents, healthcare providers, and businesses. The Website's search functionality serves as a core feature that Merck provides to facilitate user access to its vast repository of medical and pharmaceutical information. When users enter search queries, they reasonably expect these searches to remain private, particularly given the sensitive nature of medical and pharmaceutical information being sought.

**B. Defendant's Website's Search Function.**

16. Merck embedded tracking software into its Website to identify and market to individual visitors, effectively deanonymizing them. While the Website's Search Bar ostensibly allows users to search for material relevant to their health care needs, it simultaneously serves a secondary, undisclosed purpose: revealing to various data and marketing companies the identity of Website visitors and recording the specific terms each user searches for.

17. The technical process by which Merck captures and disseminates users' private search data is both deliberate and sophisticated. As used herein, "DATA COMPANIES" means third-party entities, including but not limited to LinkedIn, Google Ads, DoubleClick, and Twitter Ads, that intercept and collect Merck user search queries and related data. The DATA COMPANIES obtain the contents of search queries by sending "GET" requests across the network to intercept communications with the Website. These GET requests retrieve data from specific endpoints on Merck's server whenever a user generates a search results page. In response to these GET requests, the Website automatically provides the DATA COMPANIES with the search terms in a file format that can be stored and merged with other existing data about website visitors, enabling the comprehensive profiling of users.

18. When Plaintiff utilized the Search Bar, their web browsing session was recorded in an HTTP Archive ("HAR") file, which documented all network communications between Plaintiff's browser and web servers. Analysis of the HAR file

reveals a systematic process of data collection and sharing by multiple third-party companies. LinkedIn (through px.ads.linkedin.com) captured the referrer URL containing search terms along with tracking pixel IDs and browser details. Google Ads (www.googleadservices.com) collected tracking identifiers, search terms, cookies, and device data. DoubleClick (googleads.g.doubleclick.net) gathered referrer URLs, tracking pixels, cookies, and device specifications. Twitter Ads (analytics.twitter.com) obtained search terms, event IDs, and unique tracking identifiers.

19. The transmission of this sensitive data to the DATA COMPANIES occurred instantaneously upon Plaintiff's use of the Search Bar, without notice or consent. The scope of information transmitted far exceeds what would be necessary for the basic functionality of Merck's website. Significantly, Merck's system triggers these data transmissions **before** the Website has served the final search results page to the user—meaning the queries are captured **in transit**, rather than after completion of the communication. Through the inclusion of unique identifiers, detailed device specifications, and complete URLs containing search terms, these companies can compile comprehensive profiles of users and track their behavior across multiple websites over time.

20. Merck's cookie banner purports to offer users meaningful control, yet the embedded code continues to intercept and transmit search queries even after users deny consent. Such conduct defeats any claim of "consent," as it occurs surreptitiously without user agreement or knowledge.

21. Merck's practices are particularly deceptive given the Website's misleading privacy controls. Users are presented with a "cookie policy" that claims "Your Privacy Choice Is Important to Us" and encourages users to "Customize my Settings." Despite Plaintiff selecting only "Essential" and "Functional" cookies, Merck's website continued to share Plaintiff's search queries and personal data through various cookieless tracking mechanisms. These included LinkedIn's "attribution_trigger" URL system, Google Ad Network's embedded tracking parameters, DoubleClick's tracking URLs, and Twitter's direct URL parameter collection. Each of these mechanisms deliberately circumvented Plaintiff's expressed privacy preferences while capturing sensitive search data.

22. The chart below shows what the Merck website promises users and what happens.




### C. <u>Plaintiff's Experience</u>.

23. Plaintiff visited <u>www.merck.com</u> on September 4, 2024, where she encountered Merck's deceptive privacy management system. Much like a building's

security desk that requires visitors to sign in and declare their preferences, Merck's Website presented Plaintiff with a consent management interface - a digital gateway that prominently declared "This Site Uses Cookies and Your Privacy Choice Is Important to Us" and encouraged users to "Customize my Settings." This interface was designed to create an illusion of privacy control, similar to having a security guard assure visitors their access will be limited while secretly providing master keys to multiple third parties.

24. Concerned about data privacy, Plaintiff reviewed the Website's privacy options and selected only 'Essential' and 'Functional' cookies, explicitly rejecting all other forms of tracking. The interface presented what appeared to be meaningful choices about data collection and sharing, categorized into different types of tracking. Plaintiff deliberately selected only "Essential" and "Functional" cookies - analogous to agreeing only to basic identity verification at a medical office - while explicitly rejecting all other forms of tracking and data collection. The Website acknowledged these choices with a confirmation message stating "Your choices have been saved" and represented that only essential website functions would remain active. These representations were materially false and deliberately misleading, as technical evidence would later reveal.

25. Following these purported privacy selections, Plaintiff utilized the Website's search functionality to query "work from home California." Unknown to Plaintiff, this single search action triggered a sophisticated surveillance system that operated independently of and in direct contradiction to the privacy choices Plaintiff had just expressed. This system functions similarly to a wiretap, intercepting the search terms

before they reach their intended destination and simultaneously transmitting copies to multiple third parties.

26. Technical analysis through HTTP Archive (HAR) files - which serve as a detailed digital record of all network communications, similar to phone company call logs - reveals the precise mechanism of this data collection. The moment Plaintiff's search query was entered, before any results were even displayed, Merck's Website initiated multiple simultaneous data transmissions to third-party advertising networks through a system specifically engineered to circumvent standard privacy controls.

| Domain | Service | Request | Headers | Data Sent | Response Headers |
|---|---|---|---|---|---|
| px.ads.linkedin.com | LinkedIn | GET | :authority: px.ads.linkedin.com :method: GET :path: /attribution_trigger?... | Referer URL (including the search term "work from home California"), a tracking pixel ID, and browser details | content-type: application/json content-encoding: gzip |
| www.googleadservices.com | Google Ads | GET | :authority: www.googleadservices.com :method: GET :path: /pagead/conversion?... | Tracking identifiers, URL with search term, cookies, | content-type: application/javascript cache-control: no-cache |

| **Domain** | **Service** | **Request** | **Headers** | **Data Sent** | **Response Headers** |
|---|---|---|---|---|---|
| | | | | device and conversion data | |
| googleads.g.doubleclick.net | DoubleClick | GET | :authority: googleads.g.doubleclick.net<br>:method: GET<br>:path: /pagead/viewthroughconversion?... | Referer URL, tracking pixel ID, cookies, device specifications | content-type: text/javascript; charset=UTF-8<br>cache-control: no-cache |
| analytics.twitter.com | Twitter Ads | GET | :authority: analytics.twitter.com<br>:method: GET<br>:path: /1/i/adsct?... | Referer URL with search term, event ID, unique tracking identifiers | content-type: image/gif;charset=utf-8<br>cache-control: no-cache |

27. The technical sophistication of this data collection system warrants detailed explanation. When Plaintiff's browser sent the search request, Merck's Website responded by executing what are known as "GET requests" - essentially digital copies of Plaintiff's search that were automatically dispatched to multiple advertising companies. These GET requests contained not just the search terms, but also detailed technical information that could be used to identify and track Plaintiff across different websites:

28. Device Fingerprinting Data:

a. Screen Resolution: 1280x720 pixels

b. Browser Type: Chrome version 130

c. Operating System: Windows

d. Connection Parameters: Network type and speed

i. Hardware Specifications: Graphics capabilities and system configuration

29. Unique Identifiers:

a. LinkedIn Tracking ID: pid=403593

b. Facebook Parameters: id=227995338998622, fbp=fb.1.1729713353270

c. Google Analytics IDs: gcd=13t3t3t3t5l1, auid=1554501659.1729713354

d. Bing/Microsoft IDs: ti=5820275, mid=6bab992e-9e4e-4d28-a9ca-b0961d9f9011

e. Parse.ly Analytics: plid=bcce014b-b321-4215-b31d-45791fb18bee

30. These identifiers function like digital Social Security numbers, allowing advertising companies to build and maintain detailed profiles of users across different websites and over time. The transmission of these identifiers directly contradicted Plaintiff's explicit privacy choices.

31. Merck's system used multiple techniques—cookieless tracking, server-side data collection, and real-time data synchronization—to continue collecting data despite Plaintiff's clear denial of consent.:

a. Cookieless Tracking: By embedding tracking parameters directly in URLs, Merck's system bypassed traditional cookie-based privacy controls. This is analogous to a store claiming they won't track customer movements while secretly placing GPS trackers in their shopping bags.

b. Server-Side Data Collection: Rather than respecting browser-based privacy settings, Merck's system transmitted data directly from their servers to advertising partners, effectively circumventing any client-side privacy protections Plaintiff had enabled.

c. Real-Time Data Synchronization: The system simultaneously transmitted identical data to multiple advertising partners, allowing them to synchronize their user profiles and create a more comprehensive tracking profile of Plaintiff.

32. The architecture of this system demonstrates its deliberate design to defeat privacy controls while maintaining a false facade of user choice. Each component was carefully engineered to ensure data collection would continue regardless of the privacy choices users made in Merck's consent interface. The technical evidence reveals that Merck's consent manager served primarily as a deceptive facade - similar to a bank vault

with a false door that appears secure while secretly providing access through multiple hidden entrances.

33. This comprehensive tracking architecture caused Plaintiff concrete harm through:

a. The unauthorized interception and capture of private search activity

b. The creation and distribution of persistent tracking identifiers

c. The compilation and sharing of detailed technical fingerprinting data

d. The synchronization of this information across multiple advertising networks

e. The deliberate circumvention of explicitly expressed privacy preferences

34. These harms were compounded by Merck's deceptive practice of presenting a privacy choice interface that had no practical effect on the Website's underlying tracking mechanisms, creating a false sense of privacy control while actually facilitating comprehensive surveillance of user activity.

35. Unauthorized data sharing imposes tangible economic burdens on individuals, particularly through the costs associated with removing personal information from data broker databases. Data removal services, which assist consumers in reclaiming their privacy, typically charge annual fees ranging from $99 to $355,[1] depending on the provider and the extent of services offered.

[1] https://cybernews.com/privacy-tools/best-data-removal-services/

36. These expenses represent a direct financial impact on individuals seeking to mitigate the unauthorized dissemination of their personal data.

## CLASS ALLEGATIONS

37. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class Members") defined as follows:

> **All persons within California whose search queries on Defendant's Website were intercepted and transmitted to third parties without their consent within the statute of limitations period.**

38. NUMEROSITY: The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. The identity of Class Members is ascertainable through Defendant's records or by public notice.

39. COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class Members. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Merck's Website search functionality was designed and implemented to automatically intercept and transmit user search queries to third parties;

b. Whether Merck's consent management system was designed to override and ignore user privacy choices through its implementation of cookieless tracking mechanisms;

c. Whether the technical architecture of Merck's tracking system, including its use of GET requests and real-time data synchronization, was uniform across all user sessions;

d. Whether Merck obtained valid consent before intercepting and transmitting Class Members' search queries;

e. Whether Merck's representations about its privacy controls were materially false and misleading;

f. Whether Merck's uniform technical implementation of its search and tracking systems violated CIPA;

g. Whether Merck's standardized privacy misrepresentations violated California's UCL;

h. Whether Class Members are entitled to statutory damages under CIPA;

i. Whether Class Members are entitled to injunctive relief requiring Merck to cease its unlawful practices and implement genuine privacy controls.

40. TYPICALITY: Plaintiff's claims are typical of the claims of the Class Members, as they are all based on the same factual and legal theories.

41. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper can be excluded.

42. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. The class action mechanism is particularly appropriate in this case due to the uniformity of Defendant's conduct across all users and the technical nature of the evidence required to prove the violations. Individual actions would be prohibitively expensive and could lead to inconsistent results, undermining the purpose of CIPA to protect Californians' privacy rights consistently.

**<u>FIRST CAUSE OF ACTION</u>**

**Violations of the California Invasion of Privacy Act**

**Cal. Penal Code § 631**

43. CIPA, specifically section 631(a) of California's Penal Code, imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

44. Defendant aids and abets violations of CIPA by knowingly providing substantial assistance to the DATA COMPANIES in their unauthorized interception of Website users' private medical and health-related search queries. Defendant intentionally designs and implements sophisticated tracking architecture that enables

these companies to intercept user communications in real-time. Through its technical implementation, Defendant ensures the DATA COMPANIES receive immediate access to private search queries through GET requests while simultaneously transmitting unique identifiers (such as LinkedIn tracking ID 403593, Google Analytics ID gcd=13t3t3t3t5l1) that enable persistent tracking. Defendant maintains ongoing business relationships with these companies, providing them specific technical specifications for intercepting user data, while knowing they use these intercepted communications to build detailed profiles of users' medical research activities.

45. The interception and transmission of users' search queries through Defendant's technical system constitutes unauthorized access to communications while in transit. The GET requests embedded in Defendant's Website code actively extract and capture the contents of user communications before they reach their intended destination, functioning as a digital wiretap that copies private messages to unauthorized recipients. This system operates automatically and without valid consent, as demonstrated by its deliberate circumvention of user privacy choices through cookieless tracking mechanisms.

46. The private nature of search queries on Defendant's medical information Website is well-established under CIPA. Courts have recognized that search queries reveal intimate details about an individual's interests, concerns, and intentions. This protection is particularly vital in the medical context, where search queries may reveal sensitive health information. Defendant's unauthorized interception and disclosure of

these private communications to multiple advertising companies constitutes a direct violation of CIPA's core privacy protections.

47. CIPA imposes civil liability and statutory damages for these violations under California Penal Code § 637.2. The statute recognizes that unauthorized interception and disclosure of private communications causes concrete harm, particularly in the context of sensitive medical information seeking. Therefore, Plaintiff and Class Members are entitled to statutory damages, injunctive relief requiring cessation of these practices, and disgorgement of unlawfully obtained data.

48. Because Merck designed its embedded code to forward user queries the instant a user pressed 'Enter,' Merck captures the communication **while it is in transit** and, in the alternative, **aids** third parties in the same. These practices fit squarely within the second and fourth clauses of Cal. Penal Code § 631(a).

## SECOND CAUSE OF ACTION

### Violations of California's Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, et seq.

49. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

50. Defendant Merck Sharp & Dohme LLC ("Merck") has engaged in unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, by systematically intercepting, monetizing, and disseminating users' private search queries entered into

Merck's website search bar feature without lawful consent, transparency, or compensation. Merck's conduct deprives consumers of their statutory and constitutional privacy rights while profiting from the unauthorized exploitation of sensitive personal data.

**A. <u>Unlawful Practices</u>**

51. Merck's conduct violates the UCL's "unlawful" prong by contravening California's privacy statutes and constitutional protections. The consent banner displayed on merck.com—which prompts users to "Accept," "Deny," or "Manage Preferences" for data collection—fails to comply with the California Consumer Privacy Act's ("CCPA") requirement to provide clear, meaningful notice and obtain valid consent before sharing personal information with third parties. Merck's banner omits critical disclosures about its use of embedded code to transmit users' search terms (e.g., "work from home California") to advertising networks via automated "GET requests," as alleged in Plaintiff's First Cause of Action. This covert interception violates Cal. Penal Code § 631 and undermines the California Constitution's guarantee of privacy.

**B. <u>Fraudulent Practices</u>**

52. Merck's consent interface is inherently "fraudulent" under the UCL because it misrepresents users' ability to control data collection. The banner prominently states that user choices govern Merck's use of technologies "for analytics, personalization, and targeted advertising," creating the false impression that selecting "Deny" will prevent third-party tracking. In reality, Merck's technical logs confirm that

even when users reject consent, the website continues to intercept search queries and transmit them to Google/DoubleClick, LinkedIn, and Twitter. This bait-and-switch scheme exploits users' trust in Merck's status as a healthcare provider, misleading them into believing their sensitive searches for pharmaceutical or employment-related information remain confidential.

53. The fraud is further evidenced by Merck's deliberate design choices. While the consent banner appears tailored to California users—displaying granular options to comply with state laws—Merck's backend systems disregard rejections, ensuring uninterrupted data flows to third parties. This systematic deception is material to consumers, who rely on privacy assurances when researching sensitive topics on corporate websites.

### C. <u>Unfair Practices</u>

54. Merck's conduct is "unfair" under the UCL because it causes substantial injury to consumers that outweighs any purported benefits. By rendering the "Deny" option functionally meaningless, Merck deprives users of their right to control the commercial exploitation of their personal information. The intercepted search terms—which Merck monetizes through partnerships with third-party advertisers—have quantifiable market value, as demonstrated by the revenue generated from targeted ad placements. Consumers suffer concrete economic harm through the unauthorized appropriation of their data's value and the costs of mitigating privacy breaches caused by Merck's surveillance.

55. Merck's practices also violate established public policies enshrined in CIPA, the CCPA, and California constitutional privacy rights. There is no legitimate justification for Merck's deception: Its corporate website (merck.com) does not require third-party tracking to function, as it primarily provides static information about pharmaceutical products. The sole apparent purpose of the faulty consent banner is to evade legal accountability while profiting from covert data sales—a practice that offends basic notions of fairness and ethics.

**D. Causation and Injury**

56. Defendant's deceptive consent banner directly caused Plaintiff's injuries. Plaintiff reasonably relied on the "Deny" option to protect her privacy, given the banner's clear representation that users could reject non-essential tracking. As a direct result of this deception, Plaintiff's personal information was collected and monetized without authorization, causing actual economic harm through the theft of her personal information's commercial value and exposure to commercial exploitation.

57. These injuries are not speculative. Personal information has concrete market value, as demonstrated by the prices companies pay to acquire it. Defendant profits directly from sharing users' information with third parties, effectively converting consumers' private information into corporate revenue without authorization or compensation.

**E. Business Practice**

58. Defendant's conduct represents a long-standing pattern and practice. The deceptive consent banner appears on every visit to Defendant's website, and the unauthorized data sharing occurs systematically through embedded code. Defendant has maintained this practice despite growing privacy concerns and regulations, demonstrating a deliberate strategy to profit from consumer deception.

**PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class and naming Plaintiff as representative and her attorneys as Class Counsel to represent the Class Members;

2. An order enjoining Defendant from embedding code that intercepts search queries or transmits them to third parties without fully informed consent, and requiring Defendant to purge all wrongfully obtained data from its systems and from any third-party databases;

3. Statutory damages of $5,000 for Plaintiff and each Class Member for each violation of CIPA;

4. Order restitution and disgorgement of all revenues, profits, and other benefits Defendant obtained through its unlawful and unfair business practices in violation of the UCL;

5. An award of costs and expenses;

6. Punitive damages; and

7. Such other and further relief as the Court deems just and proper.

DATED: January 30, 2025

**TAULER SMITH LLP**

By: *_/s/ Robert Tauler_*

Robert Tauler, Esq.
Attorneys for Plaintiff
Sarah Escobedo

**CERTIFICATE OF SERVICE**

I hereby certified that I served the foregoing document on all parties of record by CM/ECF.

DATED: January 30, 2025 **TAULER SMITH LLP**

By: */s/ Robert Tauler*
Robert Tauler, Esq.
Attorneys for Plaintiff
Sarah Escobedo